Edward J.M. Little
Lisa A. Cahill
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York  10004-1482
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
little@hugheshubbard.com
cahill@hugheshubbard.com

*Attorneys for Defendant Sanjeev Jayant Kumar Shah*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SANJEEV JAYANT KUMAR SHAH,<br><br>Defendant. | 10 Cr. 1169 (WHP) |

## SENTENCING MEMORANDUM FOR SANJEEV SHAH

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   CASE BACKGROUND .........................................................................................4

III.  VARIANCE ARGUMENTS ...................................................................................7

     A.    The Nature and Circumstances of the Offense, Under 18 U.S.C.
          § 3553(a)(1) ...............................................................................................9

     B.    The History and Characteristics of Shah Under 18 U.S.C. § 3553(a)(1)...............12

     C.    The Purposes of Sentencing  Under 18 U.S.C. § 3553(a)(2)................................15

IV.   CONCLUSION.....................................................................................................18

This memorandum is submitted on behalf of defendant Sanjeev Jayant Kumar Shah, scheduled to be sentenced by the Court on August 19, 2011.  We have also attached letters to the Court in support of Shah (Exhibit A).  For the reasons stated below and in those letters, we respectfully submit that a minimum incarceration sentence is the just sentence for this defendant due to the extraordinary circumstance of this case.

## I.

## <u>INTRODUCTION</u>

Shah was formerly employed as an international financial adviser at Smith Barney LLC ("Smith Barney").  After he was terminated in late March 2009 for unrelated reasons, he sought advice from his present lawyers about unauthorized transactions he had conducted in client accounts to cover trading losses.  He accepted his lawyers' advice and voluntarily agreed to have them report his activities to the U.S. Attorney's Office and thereafter to Smith Barney to resolve the situation.  On the insistence of the U.S. Attorney's Office, he later entered into a plea agreement (Exhibit B) requiring that he plead to one count of securities fraud and three counts of wire fraud (Exhibit C, Information).

The essence of the case is that Shah, out of extreme embarrassment over a losing trade he had placed for one customer, used approximately $2 million dollars of his own money to cover margin calls and then, when he was out of money, panicked and "borrowed" $3.25 million from another customer's account to cover additional margin calls on the mounting losses.  While he understands that his actions were grossly improper, he took this action while rationalizing at the time that he could trade out of the losses and repay the second customer's account.

The plea agreement contains a stipulation to an offense level of 26, for a range of 63 to 78 months, under the Federal Sentencing Guidelines.  While the parties waived the ability to move for departures from the stipulated Guidelines range, or to seek adjustments from it, they

agreed that either could seek a sentence outside the range.  We do so now on Shah's behalf and in reliance on the factors set forth in 18 U.S.C. § 3553.

The important thing to stress in this case is that, in addition to seeking legal advice and agreeing to report himself to the prosecutors, Shah did not act out of any selfish or venal motive and never sought to make any personal gain.  However, he recognizes that what he did was wrong and accepts responsibility for that.  For these and other reasons detailed below, we respectfully urge the Court to consider a sentence that is "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing.  18 U.S.C. § 3553(a).

The most important thing here is that Shah quickly took responsibility for his actions.  As a U.K. citizen, with an E.U. passport, and extensive connections in London and Kenya, Shah could easily have fled the country after being apprised by his counsel of the serious consequences of his conduct.  With both Smith Barney and the government still unaware of that conduct, he could have left the country and never returned, with the prospects of eventual extradition highly unlikely.  But he stayed and unhesitatingly followed his lawyer's advice to disclose his actions to the government and his employer and remain to face the consequences.

Shah's original intent and state of mind are also critical factors in determining a fair and just sentence.  He did not set out to defraud any Smith Barney customer, and he never attempted to enrich himself.  The problem began after he placed a complicated set of currency trades for one customer that went bad because of mistakes he made in his initial calculations. When the trades went bad and resulted in heavy margin calls, he panicked because he did not want to inform the customer of his errors and repeatedly tried to cover the losses with his own money, eventually losing almost $2,000,000.  It was only after he ran out of money that, in a desperate and irrational decision to "borrow" money from another customer in the hopes of

trading out of the loss, Shah made the false statements to his customers and created the fictitious

documents that are the basis for the fraud charges. Even then, he had desperately deluded

himself into believing that the currency market might move in his favor and enable him to make

up for the losses and repay the second customer whose funds he had taken.

There is no question that Shah was not motivated by any thought of personal gain

or venality. These were the actions of a young man who was driven by extreme embarrassment

over his mistakes in placing the initial set of currency trades for the first customer and a pathetic

fear of having to inform that client of what happened. For these reasons, we respectfully urge

the Court, in keeping with section 3553's directive to consider "the nature and circumstances of

the offense," to judge Shah's conduct, not in isolation but in consideration of all the mitigating

circumstances of this case.

Finally, mindful of the Second Circuit's statement that "[i]t is difficult to see how

a court can properly calibrate a 'just punishment' [as required under section 3553(a)(2)(A)] if it

does not consider the collateral effects of a particular sentence," we would like to take this

opportunity to describe how much Shah has already, in effect, been punished and will be

punished for his actions beyond any sentence this Court might impose. *United States v. Stewart*,

590 F.3d 93, 141 (2d Cir. 2009).

As explained below, he has shamed not only himself, but his proud and

respectable family and the people who are most dear to him. He will almost certainly be

deported and barred from living in the country in which he had made his home and established

his career. He will certainly never be able to work in the securities industry again after spending

years gaining experience and building relationships. And not least of all, he has to face the

prospect of repaying $3.25 million in restitution for the mistakes that he made that were never intended to make him money.

## II.

## CASE BACKGROUND

Shah joined Smith Barney as an international financial adviser in October of 2005 and worked there steadily and successfully until he was terminated in March of 2009 for an unrelated problem. He had overlooked notice he received for an offshore customer to meet a capital call on a private equity investment that resulted in a default. After consulting with a civil lawyer about that situation, Shah told him about the bad currency trade at issue here, that it was still an open trade, that he had taken $3.25 million from another customer to cover margin calls, hoping that he could trade out of the loss and repay the money. That lawyer referred Shah immediately to present criminal counsel.

Within a day and with Shah's knowledge and agreement, counsel contacted the Chief of the Securities Fraud Unit of the U.S. Attorney's Office and met with the prosecutors shortly thereafter, on April 3, 2009. By then Shah realized that he not only faced heavy civil liability for the $3.25 million he had moved from the other customer's account, but that he was also criminally liable for the fraudulent statements and documents he had necessarily made and created in his vain efforts to deal with the problem he created. Nevertheless, he gave his passport to his lawyers for them to hold and remained in New York to meet with them and later with lawyers for Smith Barney to fully disclose what he had done. He did this despite the fact that he could easily have left, never to return, because he is a U.K. citizen, holding an E.U. passport, with extensive ties and family resources in Kenya and other countries, with no outstanding warrants. He remained to face the consequences of his actions.

4

While it is agreed that Shah did not enter into this series of transactions with fraudulent intent for personal gain, he has pled guilty to one count of securities fraud and three counts of wire fraud. The securities fraud count is based on Shah's false statements to the first customer, Concorde Bank (for which he placed the set of currency trades that later went bad) and false statements to the second customer, Belize Bank (from whose account he took the $3.25 million to cover margin calls on the bad trade). The wire fraud counts are based on actions Shah took to accomplish the transfer of the money from Belize Bank's account to Concorde Bank's account to cover its margin calls (including a forged wire transfer authorization, a wire transfer from Belize Bank's account, and a related telephone call with a Belize Bank representative in which Shah misrepresented the purpose of the transfer).

For sentencing purposes, the government and the defense have stipulated to a Guidelines range of 63 to 78 months, based on offense level 26 and criminal history category I. While the parties further agreed that neither would seek from the Court a departure or adjustment from the Guidelines themselves, they are free to seek a sentence outside of the Stipulated Guidelines Range "based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)."

Shah also consented to the entry of an order of forfeiture (Exhibit D), providing for entry of judgment against him in the amount of $3,250,000, "representing the amount of proceeds obtained as a result of the securities fraud and wire fraud offenses alleged in the Information." The plea agreement makes clear that such consent judgment is in addition to, not

in lieu of, a restitution order made mandatory in this case by 18 U.S.C. §§ 3663A, 3664.[1]  Shah also acknowledged in the agreement that as a result of his guilty plea, he will likely be deported.

Shah pled guilty to the information and waived his right to indictment before Magistrate Judge Katz on November 24, 2010.  Exhibit E (transcript of proceedings).  The government wrote the Court on February 23, 2011 to request  the Court to accept that plea.  Exhibit F.  Since that time, however, the parties have discovered that the plea agreement's disclosure of the maximum term of supervised release on the wire fraud counts is not correct (and the error was repeated during the plea proceeding).  Instead of a maximum of three years' supervised release exposure as reflected in the plea agreement and the plea transcript, the wire fraud counts carry a maximum exposure of five years.  18 U.S.C. § 3583(b)(1).  With that modification, we join the government in requesting that the Court accept Shah's plea.

The Probation Department issued its Presentence Report ("PSR") on April 1, 2011, and Shah served his objections to the PSR on August 4, 2011.  Exhibit G.  The Probation Department has taken the position that the parties' stipulated offense level is two levels too low on the ground that there should be an upward adjustment of four levels because of Shah's position as an investment advisor instead of only two levels for abuse of a position of trust.  In our objections to the PSR, we stated the following:  "While there is an argument for this adjustment, it must be stressed that both we and the prosecutors stipulated to offense level 26 (with a range of 63 to 78 months) before Shah entered his guilty pleas.  Although recognizing that that stipulation does not bind the Court, Shah fairly understood his Guidelines' exposure at

---

[1]    The provision for forfeiture of the $3.25 million in addition to the anticipated restitution of another $3.25 million is obviously duplicative, given that Shah did not take the $3.25 million for himself, but the government insisted on both as a condition to the plea agreement.

that time (assuming the Court accepted the stipulation) to be a maximum of 6-½ years.  The

Probation Department's use of the four-level adjustment, in lieu of the stipulated two-level

adjustment, potentially increases that maximum exposure by almost two years."

   We believe that if the Court agrees with our arguments below that a non-

Guidelines sentence is appropriate, it is unnecessary for the Court to choose one range over

another.  *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005), *abrogated in part on

other grounds by United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005) (precise calculation

of the range may not be necessary where "the sentencing judge, having complied with section

3553(a), makes a decision to impose a non-Guidelines sentence").

### III.

### <u>VARIANCE ARGUMENTS</u>

   As the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), the

U.S. Sentencing Guidelines are just that, guidelines: "that is, they are truly advisory."  *United

States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*), *cert. denied*, 129 S. Ct. 2735

(2009); *see also United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) ("[D]eference to the

Guidelines is not absolute or even controlling");  *United States v. McCarthy*, No. 09 Cr. 1136

(WHP), 2011 WL 1991146, at *1 (S.D.N.Y. May 19, 2011).

   The Court is required to consider multiple factors under 18 U.S.C. § 3553, the

Guidelines being merely one of these.  *Gall v. United* States, 552 U.S. 38, 49-50 (2007);  *Dorvee*,

616 F.3d at 182.  These statutory factors, "which the mandatory application of the Guidelines

made dormant, have a new vitality in channeling the exercise of sentencing discretion."  *United

States v. Delacruz-Soto*, 414 F.3d 1158, 1166-67 (10th Cir. 2005) (internal quotations and

citation omitted).  They include: (1) the nature and circumstances of the offense; (2) the history

and characteristics of the defendant; and (3) the need for the sentence imposed to reflect the

7

seriousness of the offense, promote respect for the law, provide just punishment, afford general and specific deterrence, and rehabilitation.

Given these factors, the Court has broad discretion to sentence Shah within statutory limits and to do so outside of the Guidelines. *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Cavera*, 550 F.3d at 188, 189 ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. . . . [District judges are] generally free to impose sentences outside the recommended range"). "[A] sentence outside the Guidelines carries no presumption of unreasonableness." *Irizarry v. United States*, 553 U.S. 708, 714 (2008) (citations omitted); *see also Cavera*, 550 F.3d at 190 (same)

This case cries out for a non-Guidelines sentence. Applying the section 3553 factors to the facts of this sad and tragic case certainly provides "sufficiently compelling" justification for a merciful, non-Guidelines sentence, and such a sentence would be a reasonable one. *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 50). Shah brought this prosecution on himself by dutifully reporting it through his lawyers instead of simply leaving the country when he was terminated by Smith Barney for other reasons. His conduct has none of the usual hallmarks of real criminality, like personal gain or greed or malice. Instead it was driven, pathetically driven, by panic and embarrassment over errors in complicated currency trades. The commission that Shah would have received on the trades was minimal and plainly not the motive for what he did. He has already lost his job, devastated his family and friends with his conduct and ensured that, when this is over, he will be forced to leave the U.S. permanently. All the time and effort he put into his education and training to become an investment advisor is lost as he will plainly not be employed in his field again.

It is plain that a sentence imposed outside the Guidelines would be – given these facts and circumstances – consistent with the statutory requirement that the Court impose a sentence sufficient to comply with the sentencing purposes laid out in section 3553(a)(2), *and no more*. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Stewart*, 590 F.3d at 143. It would be grossly unfair and unjust to impose a minimum Guidelines sentence of 5 years and 3 months (or, according to the Probation Department's position, a sentence of 6 years and 6 months) upon a defendant like Shah under the circumstances of this case. That is the sort of sentence that could and would be imposed on someone who, with malice aforethought, stole money out of clients' accounts for himself.

A.    The Nature and Circumstances of the Offense,
      Under 18 U.S.C. § 3553(a)(1)

As indicated, the first customer involved in Shah's transactions was an offshore bank by the name of Concorde Bank. In managing its account in the summer of 2008, Shah set up a series of foreign currency trades. Shah's plan was to pursue a so-called "butterfly strategy," a sort of "hedge" that used three separate trades – the purchases of call and put options and the selling of a put option, all at different strike prices – to balance themselves out to reduce risk and limit the maximum loss. The trades were not fully paid but were financed in part by Smith Barney's parent, Citibank, exposing the customer to margin calls in the event that the trades fell below certain marks. Shortly after he booked the trades, Shah was surprised to receive a substantial margin call from Citibank requiring additional cash to be posted as collateral. When he investigated, he discovered to his shock that he made serious errors in calculating the strike prices. He was able to meet the first margin call by closing out one of the trades, which happened to be performing well, but that was the hedge that left the rest of the trades exposed. The transaction was not authorized by the customer.

9

The remaining trades remained fairly stable until that December, when they again suffered heavy losses, provoking more margin calls.  Again without Concorde's authorization, Shah closed out the rest of the trades and sought to recover by entering into a new, less complex, currency trade.  His strategy went wrong again, however, and he was confronted with heavy margin calls in early 2009.  Conscious not only that he had made serious errors in his initial trades but also that he had avoided margin calls by engaging in unauthorized transactions, but still believing that he could trade out of this predicament, Shah decided to withhold this information from his customer Concorde.  Instead he met margin calls in February and March 2009 three times with his own money, for a total of about $2 million.[2]

Ultimately, however, Shah could not continue to meet the continuing margin calls with his own money.  Panicked, under enormous stress from his trading mistakes, sleep-deprived and, in a horrible lapse of judgment, he decided to "borrow" money from another of his customers, Belize Bank with the intent of repaying it once he, as he naively thought, traded out of the losses.  There can be no other explanation for this delusional behavior because if he didn't repay the money, it would eventually be discovered.  Thus, beginning in early March of 2009, Shah arranged for wire transfers of $1,501,250 and $1,751,250 from the Belize Bank's account by submitting forged authorizations.  He later explained the wire transfers to Belize Bank representatives by telling them that he was purchasing bonds for the bank's account.

While Shah's actions cannot be excused -- they were improper and were criminal -- they should be also recognized for what they are not.  He never set out, in conducting the first

---

[2]  Shah comes from a wealthy and prominent family of Indian origin in Kenya and was able to obtain these funds from trust accounts and other investments.

set of "butterfly" trades, to defraud Concorde Bank or Belize Bank, to steal their money or to realize any real personal gain. He was only attempting to make money for his customer Concorde; his benefit was more to please the customer than to make insignificant commissions. It was only when his strategy proved to be a disaster because of some faulty calculations he had made that Shah thought that he had to take the actions he did. He was driven by embarrassment, panic, stress and terrible sleep-deprivation and a desire to keep his job and reputation. Even then, his first, incredible response was to use his own money, his inheritance, amounting to almost $2 million. It was only after that failed that he felt that he had no recourse but to "borrow" another customer's funds.

Shah understands, of course, that fraud is fraud, no matter what the driving force, and he accepts responsibility for what he did. However, as his lawyers, we should and we must put this case into perspective so that he is not sentenced as a malevolent fraudster but as someone, otherwise a decent and law-abiding young man, who deserves mercy. Thus the "circumstances of the offense" here certainly militate in favor of leniency. *See Stewart*, 590 F.3d at 140 (fact that the defendant did not engage in the offenses for profit "mitigate[d] the gravity of the conduct at issue"; "In evaluating culpability, we cannot discount the relevance of the defendant's motivations").

As indicated in the letters submitted on his behalf, Shah had a relatively modest life style for a person in his position. He lived in sparsely furnished apartments. He didn't spend lavishly on material possessions such as luxury cars or expensive watches. He never even owned a car or bought an apartment.

Respectfully, these "circumstances of the offense" under section 3553(a)(1) militate in favor of leniency in this case.

11

B.    The History and Characteristics of Shah
      Under 18 U.S.C. § 3553(a)(1)

        Shah is a 36 year-old man, with an interesting international background -- Indian by birth, raised in Kenya, educated in the finest British schools and a U.K. citizen. He has never married and has no children. This case stands as an aberration in what has always been a law-abiding life. Until the events giving rise to his guilty plea, Shah has at all times enjoyed an impeccable professional and personal reputation, a close loving family, dear friends, the benefits of a fine education and a successful career. Indeed, and respectfully, that he has never previously had any run-in with the law is corroborative of our discussion above concerning Shah's motivations --  this is not some career criminal who had designs on defrauding any customer or Smith Barney when he embarked on the butterfly trade strategy for Concorde in the summer of 2008. We submit that Shah is, instead, someone who, faced with enormous stress, conscious he had engaged in unauthorized activity and afraid to get caught, and foolishly thinking the market would make all his problems go away, lost his judgment in trying to cover up his unauthorized activity and a failed trading strategy.

        We respectfully submit that this is precisely the kind of case the U.S. Supreme Court had in mind just a few months ago when, quoting *Koon v. United States*, 518 U.S. 81, 113 (1996), it wrote that " [i]t  has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 131 S. Ct. at 1239-40.

        Shah was born in 1974 in what was then Bombay, to Indian parents who had met in Pittsburgh when both were studying there (economics for his father and botany for his mother). Three months after his birth, his parents returned to Kenya, where generations of the

family had lived and prospered since 1918.  Shah's father is a successful businessman there, who owns a textile manufacturing business, a printing press and other businesses.  With the exception of a potentially life-threatening bout of cerebral meningitis when he was seven years old, Shah enjoyed a healthy and happy childhood in Nairobi with his parents and older brother Rajeev.

When he was 16 years old, Shah's parents sent him to England because of the superior educational opportunities there.  He first attended the Harrow School and then was admitted to the University of Bristol, from which he graduated in 1996 with a B. S. degree in Computer Systems Engineering, with First Class Honors.

Following his graduation, Shah worked for a brief time at BAE Aerospace in Fulton, England and then moved to London, where he secured a prestigious six-month internship with Goldman Sachs, employed first in their London office and then in Hong Kong.  Although he received a permanent job offer from Goldman, Shah turned it down because he was under family pressure to return to Kenya and join the family business there.  He was then 22.

As is often the case, Shah came to regret moving back to join the family business and decided to leave Kenya.  Through a friend's recommendation, he got a job at Merrill Lynch in New York in June of 1999 as a financial advisor with a plan to develop a roster of clients by networking with high-net-worth Kenyans.  He was successfully employed at Merrill until December 2003, when he was recruited away by HSBC Private Bank.  Shah stayed at HSBC for two years but then found an even better position at Smith Barney.  He moved there in 2005 and was able to bring most of his customers with him.  He prospered there, made good money and settled well in New York City, spending time with friends and a girlfriend, with whom he became particularly close, as well as visiting his brother and his family in London and an uncle, who is a prominent cardiologist in Wisconsin.

That life is now gone.  Shah not only lost his job, he lost his girlfriend, other friends, virtually all of his own money and, most important for a man his age, his career. He also lost his good health.  The stress of the criminal case brought on an episode of Bell's palsy, combined with two burst ulcers, in June 2010.  He continues to suffer from abdominal pain. Finally, even apart from whatever sentence the Court may impose, Shah faces the $3.25 million forfeiture as well as an order of restitution, and sure deportation from the U.S., losing his home for more than a decade and the City he loves.

It says a great deal about Shah, though, that he has not lost his family or most of his friends, who have stood by him and uniformly attest to his good character and the aberrational nature of his actions here.  Their letters are attached as Exhibit A.  His brother writes that "[i]t is a testament to Sanjeev's character that due to his pleasant, cheerful, helpful personality everyone including his friends are supporting him in his days of darkness."  One of those friends, Anuj Bahal, writes the following:

> Sanjeev is perceived as an outstandingly hard working and
> trustworthy friend, colleague and community member; it would be
> no exaggeration to say that all of the friends and families that know
> Sanjeev view him as an embodiment of integrity and decency.  He
> has the utmost respect for the universal core values of nurturing
> good, wholesome families, always being supportive to friends in
> need and respecting his elders and God. . . . I know the human side
> of Sanjeev, I know what a tremendous and positive influence he
> has as the emotional center of his family, friends and community.

These letters also speak in moving ways about the very real price Shah has already paid for his crimes.

The most telling evidence of Shah's character, however, is the undisputed fact that he stayed in New York to face the consequences of his conduct.  He easily could have fled but he did not.  *Cf. Gall*, 552 U.S. at 57 ("The District Court quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own

14

initiative, to change his life.  This lends strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society").

C.      The Purposes of Sentencing
        Under 18 U.S.C. § 3553(a)(2)

Subsection (a) (2) of 18 U.S.C. § 3553 requires the Court to consider the need for the sentence imposed to satisfy the following four purposes of sentencing: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;  (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Respectfully, the third and fourth of these "purposes" are really no concern here. The public does not need to be protected from Shah because he is unemployable in the finance industry, and he will almost certainly be deported from the country as a result of his conviction. Nor, given his background, does he need training, medical care or other correctional treatment.

The second purpose -- deterrence -- is also only marginally implicated here. There is no need for the sentence to cause specific deterrence -- to reiterate, Shah will not be in a position to commit these offenses ever again. *See Stewart*, 590 F.3d at 141, 147 (appropriate for the District Court to have concluded that the need for a sentence to cause deterrence and protection of the public was lessened where the conviction made it doubtful one defendant could continue the translation career that led him to the criminal activity and where another defendant was going to be disbarred).  As for general deterrence, we submit below that the penalties Shah has already suffered -- including the shame of criminal prosecution, the loss of his career, deportation from the U.S., a $3.25 million consent judgment, a mandatory restitution order, and

the impact on his health -- present a serious example of what happens when someone in his

position loses judgment and does what Shah admittedly did.

Actually, if there is a message to be sent here, we submit it should be the message

that self-reporting criminal activity is to be rewarded beyond the maximum three levels

awardable for acceptance of responsibility under the Guidelines.  *See Restituyo v. United States*,

No. 00 Civ. 8700 (LBS), 2000 U.S. Dist. LEXIS 18273, at *8 (S.D.N.Y. Dec. 20, 2000) (Sand,

J.) ("[an experienced defense lawyer] testified that, in his experience, defendants who voluntarily

disclose serious criminal conduct, of which the Government has no prior knowledge, fare better

at sentencing than if they had not made such disclosures.  *This Court's experience with*

*sentencing is consistent with this testimony.*") (emphasis added).  In fact, however, Judge Sands'

considerable experience notwithstanding, Guidelines statistics show that the number of

downward departures under § 5K2.16 for voluntary disclosure decreased substantially in the last

reporting period.  *See* Exhibit H (Table 25 from the 2009 and 2010 Sourcebook of Federal

Sentencing Statistics).  In fiscal year 2009, courts cited voluntary disclosure as the basis for

downward departures in 11 cases.  In fiscal year 2010, the same figure was zero.  *Id.*

Overwhelmingly,  it is the first purpose of sentencing spelled out in section

3553(a)(2)(A) that should govern most of all here -- "the need for the sentence imposed to reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for

the offense."  We believe, as just discussed, that the Court will promote respect for the law by

acknowledging, with its sentence, the importance of self-disclosing criminal activity and the

value of doing so.  It is precisely because he respected the laws of this country that Shah stayed

here to face the consequences of his conduct and agreed with his lawyers that they needed to

disclose that conduct to federal prosecutors and to his former employer.

16

No doubt Shah's offenses were serious ones.  However, their commission should be considered in the context of the circumstances discussed above.  To reiterate, these were not the crimes of a common fraudster, someone who cared only about himself and personal gain.  These were the offenses, the very bad mistakes made by a young man who lost judgment in a crisis under enormous stress, and who never intended to cause harm to Concorde Bank, Belize Bank or Smith Barney.

In any event, we submit that what has happened to Shah over the last two-and-a-half years, and what will happen to him for certain in the future as a result of his conviction and plea agreement, is itself already "just punishment" for his crimes.  The Second Circuit made clear in the *Stewart* case that collateral consequences of a sentence, such as disbarment, are part of what comprises a "just punishment."  *See Stewart*, 590 F.3d at 147.  Here, Shah is effectively barred from the U.S. securities industry because of his guilty plea and he will almost certainly be deported on account of his convictions.  Beyond any sentence imposed by the Court, he already has a $3.25 judgment and a mandatory restitution order to be entered against him.

These are only the most concrete aspects of his punishment to date.  Less concrete but arguably harsher penalties are the shame he undoubtedly bore in disclosing his crimes to his loving but proud family and his friends; losing his girlfriend; internalizing anxiety to the point of injuring his health; having to leave the home and City he loves; losing a career he found success and enjoyment in; and knowing that he has caused his parents the greatest pain they have ever known.  Shah's brother has written the Court that "[t]his has been the most difficult time[] our family has endured."  Reading his family's letters, there can be no doubt that is true.

## IV.

## CONCLUSION

Congress has stated clearly that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," which purposes we have just enumerated above. 18 U.S.C. § 3553(a). Respectfully, we submit that for all the reasons above and in the letters submitted on Shah's behalf, a downward variance from the Guidelines Range into Zone A (that is level 8 or below) would be consistent with that Congressional mandate and certainly a just and reasonable result in this case. *See* U.S.S.G. Chapter 5, Part A (Sentencing Table). We further request a minimum period of incarceration within the zero to six month Zone A incarceration range.

We respectfully submit that such a sentence, viewed in combination with all Shah has suffered to date and the other collateral consequences of his plea, *e.g.*, deportation, would be a just and reasonable one.

Dated:    August 4, 2011
          New York, New York

Respectfully submitted,

_____Edward J.M. Little /s/_____
Edward J.M. Little
Lisa A. Cahill
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Fax: (212) 422-4726
little@hugheshubbard.com
cahill@hugheshubbard.com